## NEXSEN *v.* NEXSEN.

### September, 1865.

The opinions of witnesses as to the capacity of the testator are only entitled to weight when accompanied by the facts upon which they are based; and it is the duty of the tribunal to consider whether the conclusions of the witnesses are sustained by the facts detailed by them.

Such circumstances as, that the will was spoken of as a will, in the presence of the testatrix, and she declared it so to be; that she retained possession of it a long time, and delivered it to her brother to keep as a valuable and important paper; and that she parted with possession of it in order to have a codicil drawn: accompanied by evidence that the disposition made by the will was that which the testatrix formerly intended, were held sufficient in this case.

Although a will were drawn by the principal beneficiary under it, and the testatrix were able to read writing and of sufficient capacity to

transact business, and yet did not read it, it may be inferred from circumstances, that she was acquainted with the contents of it.

Feebleness of mind and undue influence at the time of executing a codicil are not material in reference to the validity of the will itself, where the codicil by subsequent events has become inoperative.

The draftsman of a will is not incapacitated to be an executor or take a benefit under it.

George M. Nexsen and others, heirs at law of the testator, appealed to the supreme court, from a decree of the surrogate of Kings county, admitting to probate the will of Sarah Nexsen, deceased, of which will William Nexsen, the executor, was the proponent. The grounds of the appeal were—1. That it did not appear by the proofs taken that the alleged will was duly executed; 2. That the testatrix was incapable of making a will; 3. That the will was made under the effect of undue influence.

Sarah Nexsen, the testatrix, was a single woman, and previous to April, 1852, had resided in a house in Brooklyn with her sister Catharine. In this month her sister died, and she soon thereafter removed to the house of her brother, William Nexsen, in whose family she continued to reside until her death, in January, 1862. She was possessed of personal estate of the value of about fifteen thousand dollars, and some real estate, the value of which does not appear; and the respondent was her only brother of the full blood living at the time she went to reside with him. The appellants were a brother of the half blood, and children of a deceased brother. The will in controversy was made in July, 1852, by which she gave a legacy to her half brother, George W. Nexsen, of one thousand five hundred dollars, and a legacy of five hundred dollars each to her three nieces, daughters of a deceased brother of the full blood. All the rest and residue of her estate, both real and personal, she gave to her brother, the respondent, and constituted him the sole executor of her will.

On March 8, 1855, a codicil was added to the will, declaring that, in case the respondent should die before she did, then the devise and bequest in the will to him she gave to his three children therein named, share and share alike; and, in case the respondent should not be living at the time of her death,

then she constituted and appointed his two sons executors in his place and stead.

The testatrix was in the eighty-ninth year of her age when she died, and the respondent was over eighty years of age. He had acted as her agent in the management of her property for nearly thirty years before her death. The testimony shows that she posessessed ordinary intelligence, could read and write, and mixed in society as much as is ordinarily done by a person of her advanced age. It was abundantly established by the testimony, that, at the time of the execution of the will, she was competent to make it, and the simplicity of its provisions indicated that it could be easily comprehended by a person of even feeble intellect. The disposition of her estate was such as might naturally be anticipated.

The deceased had two brothers of the full blood, William Nexsen, the respondent, and Walter Nexsen, deceased, who left three daughters, named as legatees in the will, and three sons, and also a brother of the half blood, George W. Nexsen. He, with Walter Nexsen and Oscar Nexsen, sons of Walter Nexsen, deceased, are the appellants, and her next of kin, and the contestants before the surrogate. Catharine Nexsen, her sister, with whom she lived and kept house, died in April, 1852, and immediately after her decease the testatrix broke up their establishment and went to reside with her brother William. Catharine gave all her estate, real and personal, to her sister, the testatrix.

*The supreme court,* at general term, affirmed the decree of the surrogate allowing probate, and the contestants appealed to this court.

*J. W. Gilbert,* for appellants.

*Hagner & Smith,* for respondents.

BY THE COURT.—DAVIES, J. [After stating the facts.]—By the will offered for probate, the testatrix gave to her brother George a legacy of fifteen hundred dollars, and five hundred dollars each to her three nieces, the daughters of her deceased brother, Walter Nexsen, and the residue to her brother, the re-

Nexsen v. Nexsen.

spondent. She therefore gave to her half brother, and to the daughters of her deceased brother, three thousand dollars, and the residue to the brother, with whom she undoubtedly expected to spend the residue of her life, and upon whose kindness and care she relied. Her age at this time would naturally lead her to infer that she would be dependent on him and his family for those attentions and that care so imperatively demanded by her infirmities and advanced age. It was therefore quite in the ordinary course of things, that, soon after her removal to her brother's house, and settlement there, she should make such a disposition of her estate as this will contains. Nothing appears to indicate any reason or ground for supposing that her half brother, or the sons of the deceased brother, had any peculiar claims upon her bounty, or to share in her estate. The facts disclosed by the testimony would lead an impartial mind to the conclusion that the disposition she made of her estate was peculiarly wise and just to all concerned, and the one most calculated to promote her own happiness and comfort for the residue of her life. Nothing appears to warrant an inference, that her just expectations in this regard were not fulfilled, or that the recipient of her bounty failed in the discharge of any duty to her.

The testimony in the case leaves no reasonable doubt on the mind that at the date of the execution of the will the testatrix was of sound and disposing mind and memory.

The opinions of the witnesses from which a contrary inference might be drawn are unsustained by any facts; nay, the whole current of the testimony and the facts developed lead to the conclusion that these opinions have no substantial basis. Opinions of witnesses can only be entitled to weight, and be of any value, when accompanied with the facts upon which they are based, and, having the facts, it is for the jury or the tribunal called upon to scan and consider the testimony, to ascertain if the conclusions and opinions of the witnesses are sustained by the facts detailed by them, and from which they have drawn their conclusions. Opinions without facts are of but little importance. Delafield v. Parish, 25 N. Y. 9, 37; Clarke v. Sawyer, 3 Sandf. Ch. 351; Cilley v. Cilley, 34 Me. 162; De Witt v. Barley, 17 N. Y. 340.

It remains, then, to be considered whether the due execution of this will was sufficiently proved. And, in this connection it is first to be considered whether the contents of the paper signed by the testatrix were understood and known by her. It is undeniable that the will was drawn by the respondent, the principal beneficiary under it. He testifies that the substance of the will had been a matter of conversation between him and the deceased before it was made. This was stated on cross-examination by the contestants. On his direct examination by the proponent, he was asked to state that conversation. This was objected to by the contestants, and the objection was sustained by the surrogate. It is true that the maxim *qui se scripsit haeredem* is applicable to the case under consideration, and the rule of law arising from such a state of facts and such rule imposes on a party thus situated peculiar obligations and duties. It casts upon him, in addition to the ordinary burden of a proponent of a will, the additional one of establishing it by testimony of a more clear and satisfactory character. The courts demand, in such a case, satisfactory proof that the party executing the will clearly understood and fully intended to make that disposition of his property which the instrument purports to direct. Delafield *v.* Parish, *supra*, and cases cited.

It would, therefore, have been more satisfactory to my mind if it had appeared, unequivocally, that the will had been read over to the testatrix before execution, or that she had read it herself. The latter may, I think, fairly be inferred from all the circumstances. It appears that she could write and read writing. That for several years after the execution of this will, and nearly up to the time of her death, she was in the practice of writing and reading, and that she was of sufficient capacity to transact business. It appears from the testimony of one of the attesting witnesses (the other being absent from the State, and his handwriting having been proven), that those witnesses were requested by the respondent to proceed to his house, and there witness the execution of the will. That they found the deceased in her room at her brother's house, with the will drawn, and all ready for execution, except placing thereon a seal. That this was done by the witnesses, and the same was then signed by the deceased, and the attesting witnesses then signed as such in her presence and in the presence of each

other. It certainly would have been more satisfactory, as already observed, if it had distinctly appeared that the will had been read over to the deceased, and it had affirmatively appeared that she knew its contents. But I think it may be inferred from all the circumstances disclosed, that she was acquainted with the contents of the paper she signed. It was spoken of as a will in her presence, and such she declared it to be. It can hardly be supposed that a person of her education and intelligence would have executed a paper of that character without knowing its contents. Again: she retained the possession of the paper until within a year or two before her death, when she delivered it to her brother to keep as a valuable and important paper. She must have known what it contained thus to have characterized it, and the care with which she preserved it, also strengthens this idea. In addition, her attention was drawn to this paper about three years after its execution, and about seven before her death. This was on the occasion when the codicil was drawn and executed. She must have parted with the possession of the will to enable Mr. Hammond to draw the codicil, and it may reasonably be inferred that it was perused by her at this time, in connection with the codicil. I arrive at the conclusion, therefore, that the provisions of this will were clearly understood by the testatrix, and the testimony is abundant to show that the disposition made of her property was that which she freely intended.

The due execution of the will was sufficiently established. All the statute formalities were properly and fully observed. The testimony of Judge JOHNSON as to those formalities is clear, and sufficiently distinct to answer the requirements of the statute, and is more full and ample than evidence which this court thought adequate in Coffin v. Coffin, 23 N. Y. 9. It was said in that case, that all the statute requires is, that the act of publication and the act of requesting the witness to sign shall both be performed. These acts are distinct in their nature or quality, but their performance may be joint or connected. It a testator should say to the witness, "I desire you to attest this instrument as my last will and testament," the language would import not only a request, but a clear publication of the will. In the present case, the two acts of publication and re-

quest were separate and distinct. The will was first signed by the testatrix in the presence of the two witnesses. She was then asked by one of them if she acknowledged and declared it to be her last will and testament, to which she replied that she did. She was then asked by the same witness if she wanted them, that is, Hammond and himself, then present, to sign the same as witnesses, to which she also replied that she did; and the two witnesses then signed the will as such, in her presence and in the presence of each other. It is difficult to conceive of a more literal and complete compliance with the formalities of the statute touching the execution of wills than was here observed. It follows that the surrogate properly admitted the will to probate.

It is a matter of no particular moment to inquire whether the testatrix had testamentary capacity at the time of the execution of the codicil. The respondent having survived the testatrix, it became wholly inoperative, as it was not designed to have any effect unless upon the contingency of his dying before the testatrix. It was a natural and obvious disposition of the property to give it to the children of her brother if he should die before herself. They occupied the same house with her, and were daily ministering to her wants and comforts. It was, therefore, reasonable and proper that she should desire to secure her estate to them, in the event of its not being received by their father. And it was eminently discreet in her, considering the advanced age of her brother, and the uncertainty of his surviving her, that she should make provision for another executor or executors in case of his decease, before her death. And no inference of undue control can be predicated of the the fact that in such a contingency, she designated his two sons as her executors. One of them, it appears, lived in an adjoining house to that occupied by her, and frequently transacted business for her.

But even if her mind was feeble at the time of the execution of this codicil, and undue influence had been exerted to procure it, these circumstances would not necessarily show or establish want of testamentary capacity at the time of the execution of the will, in July, 1852, or that that instrument was procured by the exercise of undue influence or control. In the case of

Coffin v. Coffin, supra, the circumstance that the person who prepared the will was appointed one of the executors, and was also a legatee, was urged as a consideration why the court should infer fraud and undue influence in procuring the execution of the will. It was justly said, in that case, that facts of this kind may and do often very justly excite the suspicion of courts, when fraud and undue influence are alleged. But it is not a rule or principle in the law of testaments, that the draftsman of a will cannot be an executor, or cannot take a benefit under it. There seems nothing unnatural, therefore, in the selection of the respondent as the executor, but, on the contrary, he seems peculiarly to be the most proper and obvious person to be selected for the performance of the duties incident to that office. The same remark might apply with equal force to his being selected by the testatrix as the beneficiary of the bulk of her estate. The considerations most likely to have influenced her mind in making such a disposition, have already been adverted to. They are obvious and natural, and such as would be most likely to influence and govern persons in the disposition of their estate. We see no facts disclosed in the testimony, nor any force in the considerations urged upon us, which would authorize us to reverse the conclusions of fact to which the surrogate arrived in this case, in his judgment admitting this will to probate, and we must, therefore, affirm the judgment of the supreme court, which, in our opinion, correctly affirmed that of the surrogate.

All the judges except POTTER, J., concurred in this opinion.

POTTER, J. [Dissenting.]—The appellants present three points of objection to the judgment of the general term and of the surrogate, to the admission of the will and codicil in question to probate: First, that they were not properly executed; second, that the testatrix was not of sound mind or competent to execute a will; third, that the execution of the will and codicil was obtained by undue influence over the mind of the testatrix.

Each of these positions depends, for its correctness, upon the facts of the case. And each point so raised depends, for its

Nexsen *v.* Nexsen.

soundness, upon the truth or correctness in degree of the others; and this case belongs to that class of cases where the duty of examing the facts belongs to this court, and in this regard they are not aided by the findings of the courts below any further than to the extent of that respect which one court is bound to pay to opinions from so respectable a source, but which are in no wise to be regarded as controlling.

If we look into the books for authority to direct us in our duty on this review, we cannot find it. The cases all depend upon a peculiar state of facts, and each case upon its own, which has no parallel; and opposite opinions between the most distinguished judicial minds are found drawn from the same facts in a given case. The case of Delafield *v.* Parish, in this court (reported in 25 *N. Y.* 9), is an instance of this kind. So, too, cases reported from the highest court of authority in this State, in which rules seem to be laid down for the government of courts in future, are either overruled or so discredited by subsequent decisions that they are now disregarded as authority. Steward *v.* Lispenard 26 *Wend.* 255, and Blanchard *v.* Nestle, 3 *Den.* 37, are instances of this class. And, if any standard of capacity to make a will has been established by statute or common law in this State, still, the question whether a particular case comes up to that standard, depends, after all, upon the facts, which are generally conflicting, and upon which judges, also, equally distinguished for legal wisdom and discrimination, arrive at entirely opposite conclusions as to that capacity. No mere judge has yet been found, I think, capable of drawing a precise and definite line, which shall be adopted as a rule of law to distinguish between idiocy and mental power; and, if this could be done, no two cases could be found in which, in their facts, there would not be such important differences as to bring it back to the question of fact, whether it did or did not come up to the established line.

In the case of Delafield *v.* Parish, *supra*, which is one of the latest cases, a quorum of this court held it to be law "that the only standard as to mental capacity in all who are not idiots or lunatics is found *in the fact* whether the testator was '*compos mentis,*' or '*non compos mentis,*' in the fixed legal meaning of those terms." If this is a general rule, applicable

to wills of both real and personal estate, then the fixed legal meaning of those terms is also a controverted question, and then an impaired memory, and an impaired mind, are held to be equivalent terms in determining the question whether the testator is *compos mentis,* or *ncn compos mentis.* Our statute contains the following provisions (2 *R. S.* § 1, pp. 56, 57, marg. paging) : " All persons, except idiots, *persons of unsound mind,* married women and infants, may devise their *real estate* by a last will and testament duly executed according to the provisions of this title." By section 20 of the same title, p. 60, " Every male person of the age of eighteen years or upward, and every female not being a married woman of the age of sixteen years or upward, of *sound mind and memory,* and no others, may give and bequeath his or her personal estate by will in writing." The language of these two sections excluding persons of "*unsound mind*" in devises of real estate, and allowing persons of "*sound mind and memory*" in personal estate, to make wills, would, from the language employed, seem to recognize a distinction between unsound mind and unsound *memory,* but the best judicial construction holds them to be identical in meaning. Judge SELDEN, in Delafield *v.* Parish, laid it down that such distinctions are too plain to be denied, and cites high authority for the existence of the distinction, and illustrates it by the case of a maniac whose memory may be sound, and whose mind may be unsound upon only a single idea. I concur in this part of his opinion. And I think it may be equally true, that a person may have an entirely sound mind upon any given question presented to it at the time, and may reason soundly upon it when so presented, but whose *memory* is so defective that it may not be able to recall any past event whatever. Judge SELDEN adds: " It is equally plain that the competency of persons belonging to one of these classes cannot be determined by rules especially applicable to another class." And he holds that persons may be *non compos mentis* who belong to either of these classes, that is, of unsound mind, or of unsound memory. I concur also in this holding.

Among the cases cited in the very able opinion of Judge DAVIES, in the same case, is that of the Marquis of Winches-

III—24

ter, 6 *Rep.* 23 A. In that case the court granted prohibition to probate, on the ground of non-sane memory. It was said, "that by law it is not sufficient that the testator be of memory when he makes the will, to answer familiar and usual questions; but he ought to have a *disposing memory*, so that he is able to make disposition with understanding and reason, and that is such a memory as the law calls a sane and perfect memory." There is also the case of Harrison *v.* Rowan, 3 *Wash. C. Ct.* 580, 585. Judge WASHINGTON said: "He must, in the language of the law, have a sound and disposing mind and memory; in other words, he ought to be capable of making his will with an understanding of the nature of the business in which he is engaged—a recollection of the property he means to dispose of, of the persons who are the objects of his bounty, and of the manner in which it is to be distributed between them." Also, the case of Clark *v.* Fisher, 1 *Paige*, 171, in which Chancellor WALWORTH held as follows: "The testator must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment in reference to the situation and amount of his property, and to the relative claims of different persons who are or might be the objects of his bounty." I have selected these cases having more particular reference to the point of the memory of the testatrix, because it seems to me that question in the case was the strongest against her capacity, and was not fully answered in the opinion of the supreme court, and it seems to be a strong feature in the testimony.

It is undisputed that the testatrix was a maiden lady, and at the time she made her will was of the age of seventy-nine, and was eighty-two when the codicil was made, was a person of quiet and reserved habits, and of weak mind, and died at the age of eighty-nine. Before April, 1852, she had resided for years with a blind maiden sister. At the sister's death she removed to the house of her brother William, the respondent; the sister died in 1852. Before making her will, she had been residing with her brother, the executor, and principal beneficiary in the will. She left in personal estate about sixteen thousand six hundred and twenty-three dollars, besides

some household furniture and wearing apparel, and a house and lot on Pearl street, the value of which is not given. She devised to her brother, George W. Nexsen, fifteen hundred dollars, to three nieces five hundred dollars each, and all the rest and remainder of her estate, real and personal, without stating its amount, she gave and bequeathed to her brother William, the executor, leaving other brothers and sisters, nephews and neices, ordinarily the object of affection and bounty, without any bequest whatever. The fact whether she had sufficient *mind* to dispose of her estate, is to be determined from testimony in direct conflict; is of great weight and strength against as well as in favor, and, to a court of review, of great difficulty of determination, without reference to the question of memory. Upon the question of memory, the contesting evidence is without contradiction. I do not propose to enter into a careful and critical analysis of the whole evidence in the case. The view I have taken of the case does not require it; though I admit the case, on the point of soundness of mind alone, is one in which, in my mind, the scale is nearly at an equipoise—so near that the *onus* of proof would change it from the one side to the other. The testatrix made the will in July, 1852, while living with her brother William. The will was in the handwriting of William. The execution of the will was proved by but one of the subscribing witnesses, the other being out of the State. This witness was procured by the executor, who was the only person present, except the witnesses, when they arrived. The will was not read by the witnesses, nor in their presence. The testatrix put her signature to the will in obedience to the directions of one of the witnesses, both of whom were lawyers. After the signature, of the witnesses put the question to her, "Do you publish and declare this to be your last will and testament, and do you wish us to sign it as witnesses?" The executor paid the witnesses five dollars each for their services in witnessing the will. If the testatrix had mind and memory enough to make this will, and if it was her will, the execution of it was doubtless sufficient.

On the subject of the memory of the testatrix, one witness, the wife of her brother, Walter Nexsen, who had known her

sixty-two years and saw her as often as once a fortnight, some-times stayed all day and all night, says, " Her memory was poor; I asked her about her friends, she had for-gotten them all; I observed her memory was failing, and after she had the paralysis her memory was still more gone." This witness also testified to the state of her mind, which I do not insert.

Barbara Bogart, who, after testifying to her state of mind, says, " I don't think her memory was strong at any time; the death of her sister had a powerful effect upon her, it confused her." On cross-examination, she says, " for the last five years I could not bring myself to her recollection. I first discovered that she did not remember me at all about six years before she died. . . After the paralysis her mind failed her rapidly."

Catherine M. Nexsen, wife of one of the contestants, age fifty-nine, had known testatrix from childhood of the witness, she testified as follows : " Katy (the other maiden sister) died in March, 1852. Sarah failed very rapidly after her sister's death, both mentally and bodily; the idea of her sister's death seemed to fill her mind. . . She seemed to lose her mind gradually altogether; she would sit alone, and walk up and down; she forgot her old friends; I would try to recall her old friends, and found she had forgot one after another, even her brother and sister; I observed that her failure of memory increased as she advanced in age.". To the question put to her, " Was she, from your observation, from the death of Katy to the time of her own death, of sound mind and memory ? " she answered, " *She was not of sound memory certainly,* and her mind was always weak." On further direct examination, she stated as follows : " Just after Katy's death she talked intelligently, her mind was not wandering or delirious at any time, she was oppressed at the idea of Katy's death ; I was surprised that she forgot John, because Katy brought him up, and she left all his property to them ; she forgot my children except my eldest daughter; this was not long ago—ten years." On further cross-examination : " The conversation about her brother John took place in the parlor of her brother William; I afterward referred to her brother John, but she had forgotten him; can't say how long before she went to her brother William's that I

f.rst found that she had forgotten John; . . it was nine or ten years ago that I found she had forgotten my children; can't say whether it was before or after the paralytic stroke; it was when she lived at William's; . . some three or four years ago, I spoke of Florence, my daughter; she said 'who is she?' I told her; she asked whether it was a boy or a girl?"

These uncontradicted statements of the impaired memory of a person of naturally weak mind, so weak indeed as to render her capacity for making a will doubtful, I think did not have due consideration in the court below. Taking the question of memory into consideration in determining whether the testatrix was *compos mentis,* I think the weight of evidence was not fully regarded.

I am still less satisfied with the decision on the question of undue influence. Taking into view the state of mind and memory of the testatrix; the relationship between her and the principal legatee and devisee; the fact that this beneficiary was her agent, that she lived with and was supported by him; the form of the will, omitting to name any sum given to the respondent; the omission to name her blood relatives equally near to her; the fact that the will was drawn by and prepared by her said confidential agent, with no evidence of its being read to her, with no evidence of directions from her as to its dispositions; the agency of the respondent in obtaining legal witnesses to its execution but not to its preparation; his liberal gifts for such service to witnesses; these are a combination of circumstances creating not only great suspicion of unfairness, but are such constructive evidence of undue influence as casts upon the respondent the onus of proving fairness and integrity on his part, in relation to the instrument produced by him, which he claims to be her will and codicil. This, I understand to be a rule of law applying to all instruments creating estates in favor of a party standing in confidential relations with the person from whom the instrument is obtained. Whether it be attorney and client, agent and principal, physician and patient, pastor and parishioner, parent and child, brother and sister—whatever the confidential relation may be where the influence that is obtained by habitual confidence, where the one is dependent or relies upon or reposes in the confidence of the

other, instruments obtained will be set aside as presumptively arising from the exercise of improper influence, and as being against propriety and public policy. In Evans *v.* Ellis, 5 *Den.* 640, a case in the court of errors, a security taken by a solicitor from his client was held to be presumptively void and unfair, and the onus of proving its fairness was on the solicitor. BEARDSLEY, J., said, " that no security given by a client to his solicitor should be allowed to stand in any case unless its fairness in every respect is shown by the solicitor." Judge STORY has said, " that the law, with a wise providence, not only watches over all transactions of parties in this predicament, but it often interposes to declare transactions void (*Story Eq. Jur.* § 315) ; and the rule is the same between principal and agent." *Id.* § 311.

In Sears *v.* Shafer, 6 `N. Y.` 268, Judge GRIDLEY sums up the whole doctrine as follows : " A court of equity interposes its benign jurisdiction to set aside instruments executed between persons standing in the relations of parent and child, guardian and ward, physician and patient, solicitor and client, and in various other relations in which one party is so situated as to exercise a controlling influence over the will and conduct and interests of another. In some cases undue influence will be inferred from the nature of the transaction alone, in others from the nature of the transaction and the exercise of occasional or habitual influence." The following authorities are to the same effect. Howell *v.* Ransom, 11 *Paige,* 538; 10 *Id.* 352; 2 *Den.* 607 ; *Hill on Trustees,* 156 to 162 ; *Story Eq. Jur.* §§ 308 to 324; 16 *N. Y.* 285; 13 *Barb.* 524; 31 *Id.* 9; 2 *Beavan,* 75 ; *Simons,* 539; 15 *Ves.* 120.

These, with a series of cases uniform in their tendency, are irresistible in their' authority in casting the presumption against the good faith of this will and codicil; they not only throw the *onus* upon the respondent as to the state of the mind of the testatrix, but more than this, the *onus* is cast upon him of showing that this will was read to the testatrix, or that she dictated and understood its terms. He has failed to do this. The advantages of the will to him are so decided, that they must be held to cast this legal presumption of fraud and breach of confidence upon the respondent. He has not met

it. " The law demands that where confidence is reposed, it must be faithfully acted on, and preserved from any inter-mixture of imposition. If influence over another is acquired, it·must be kept free from taint of selfish interests and cunning and overreaching practices. *Story Eq. Jur.* § 308. The re-spondent has failed to relieve himself from this presumption.*

If this is a correct view of the legal presumption in this case, then, even the execution of the will fails of proper proof. I am, for these reasons, for reversing the judgment of the su-preme court, and of the surrogate, admitting the will to probate.

All the judges, except POTTER, J., concurred in affirmance.

Judgment affirmed, with costs.

---

* Compare Marvin v. Marvin, and Mason v. Ring, in this volume.

