Kennedy, S.
—The testator was a resident of the town of Nelson, in this county, and died on the 22d of October, 1886, aged eighty-eight years. He had been twice married, and, at the time'of his death, left surviving him his widow, Charlotte White, Alida White, a daughter by his second wife, and a son, S. D. White, the contestant, a son by his first wife. His property consisted of a farm in Nelson worth about four thousand dollars and a few thousand dollars of personal property. By his last will made July 20, 1885, he gave to his son $150, the use of one-half his estate to his widow during her life, the use of the other half to his daughter Alida, during the life of her mother, and at her decease the entire remainder to his daughter. S. D. White, the son, contests the will on the ground that at the time of its execution the testator was not of sound, disposing mind and memory, and was incompetent to make a valid will by reason of certain alleged insane delusions which he claims the testator entertained with reference to himself, also upon the further ground that the said will was procured by the fraud, circumvention, restraint, coercion and undue influence of Mrs. White and her daughter.
From the evidence disclosed upon this trial the contestant urges a further reason for denying probate to the will in *755 question, to wit: that at the time the testator subscribed it and declared it to be his last will and testament in presence of the witnesses thereto, he had no actual knowledge.that the paper signed by him, and declared by him to be his will, was in fact the will which had been previously read to him a short time before, at the testator’s house, and the terms of which had been approved by him. The facts upon which the argument is based have much force and under some circumstances might have sufficient weight to cause the rejection of a will; at least would require but little additional evidence to accomplish such a result. We think it is the duty of the witnesses to wills to know by inquiry of the testator or otherwise whether or not he has personal knowledge of the contents of the paper he is about to sign, as his last will and testament. Unless this is done there might not be any evidence that the will had ever been read to or by him, no evidence that he ever had knowledge of its contents, and thus opportunity would be afforded to take advantage of his confidence or his carelessness to impose a will upon him not in accordance with his directions or intentions; especially would this be so in the case of the aged, ‘sick or infirm, who might be powerless to protect themselves from being surrounded by those who would not hesitate to benefit themselves by fraud, coercion or undue influence, and possibly crime. Very frequently the witnesses to wills have no knowledge of the character of the paper they sign, except the declarations of the testator. Whether it is in fact his will they do not know by any declarations of his that he has read it, or heard it read, or that he has the slightest knowledge of its contents. It is true the law does not require that such information should be imparted to the witnesses or that they shall have knowledge that such is the fact, but if the law has failed to surround the testator with every safeguard necessary for his protection and the protection of his heirs, it is- the duty of courts to see that it has been done, the duty of courts to see that not only the probabilities but the possibilities of fraud or mistake have had no part in the execution of the will. In Nexsen v. Nexsen (2 Keyes, 229), the judge after referring to the manner in which the will of the testator was executed says: “It would have been more satisfactory, as already observed, if it had distinctly appeared that the will had been read over to the deceased, and it, had affirmatively appeared that she knew its contents. But I think it may be inferred from all the circumstances disclosed that she was acquainted with the contents of the paper she signed. It was spoken of as a will in her presence and such she declared it to be. It can hardly be supposed that a person of her education and intelligence *756 would have executed a paper of that character without knowing its contents. Again she retained possession of the paper until within a year or two before her death, when she delivered it to her brother to keep as a valuable paper. She must have known what it contained thus to have characterized it, and the care with which she preserved it, also strengthens this idea.”
' The facts upon which the argument of the contestant is based are few and as follows: On the 19th day of July, 1885, John W. Northrup, of West Eaton, a justice of the peace of that place, who had drawn a former will for Mr. White, and who was accustomed to draw wills, was requested by Mrs. White, the wife of the testator, to come to the testator’s house—about a mile from Mr. Northrup’s— that he went to Mr. White’s the next'forenoon and was there told by Mr. White that he wished to change his will, or add a codicil to it. That he advised him to have a new will drawn instead of a codicil. That he wrote out what changes he desired, read them over to him and he pronounced the memorandum correct. That he then went to his mill and drew the will in question, and then took it to Mr. White’s and read it over to him, after which he, Northrup, took the will and drove with Mr. White, some distance to the house of Mr. Isbell—Mr. Isbell and his wife having witnessed a will of Mr. White’s a year before—to have it executed. That after they got there Mr. White entered the house and he followed with Mr. Isbell soon after. That after they entered, a table, pen and ink was produced by Mrs. Isbell, whereupon the will was placed upon the table by Mr. Northrup, and Mr. White immediately declared it to be his last will and testament, and either he or Mr. Northrup, in Mr. White’s presence requested Mr. and Mrs. Isbell to sign it as witnesses. That at this time Mr. White did not read the will, nor was it read to him, nor was it examined by him to see if it was the same will which had theretofore been read to him by Mr. Northrup, at his house, so that the only evidence that Mr. White was aware of the contents of the paper he signed is the testimony of Mr. Northrup. We have no doubt, from Mr. Northrup’s evidence, taken in connection with other circumstances that the will in question, is the one read to Mr. White, at his house, no doubt it was the identical will with the contents of which he was familiar. But it will be readily seen that at the time of its execution the testator had no knowledge whether it was or was not, and an entirely different will might have been substituted by Mr. Northrup, for the will in question. Such opportunities for fraud, deception or mistake on the part of any one drawing a will, whether interested or not in its execution, ought not to be permitted, and the practice *757 should receive the disapproval of the courts. To guard as far as possible against fraud, mistake or accident, we think that in addition to the statutory declaration of the testator, at the execution of his will, the witnesses thereto should have clear and unquestioned evidence from the testator himself, that he has actual knowledge of the contents of the paper he is about to declare as his will. The fact that the testator immediately after the execution of his will, takes and keeps it in his possession afterwards, is no legal evidence that it is his will, nor does it raise such a presumption. Knowledge of its contents before its execution must be shown in order to be probated. In a recent case, decided by the general term, it was not proven that the testator gave directions for the draft of the will, nor was there any_ evidence that she had knowledge of its contents, although it was properly signed by her in the presence of the witnesses and declared by her, in their presence to be her last will and testament, and she after-wards took and kept possession of the will. The court set aside its probate because it was not shown that she either gave directions for or knew the contents of the will at the time she executed it and before its execution, and held that although she retained the will in her possession for a long time afterwards and was aware of its contents and approved of the conditions of her will, these facts were insufficient to establish its legal execution. Knowledge of its contents before execution is therefore necessary to make a valid will. Ratification of its contents afterwards does not make the will valid. The spirit, if not the letter, of this decision strengthens the force of our suggestions in regard to the executions of wills, by holding that the testator must before execution, have full knowledge of the contents of a paper he is about to declare as his last will and testament, and we only go a step farther in the protection of the testator and his heirs against the wrong-doer, by suggesting that the witnesses to the will ought to have evidence of this fact from the testator, and certify to it at the end of the will or at least be able to testify, upon its probate, to such facts as will convince the court that the testator, before and at the time of the execution of his will, had full knowledge of the contents of the paper, he declares to be his last will and testament.
Before discussing the other legal questions arising from the evidence it will be necessary to make a statement of facts:
The testator had lived nearly all his life in the town of Nelson, and was well known in that and the adjoining towns. With the exception of a slight paralytic attack in 1880, and a short illness in 1884, he had no sickness of any *758 consequence, and had always been a strong, healthy man. He had always been a man of mdre than ordinary mental strength and intelligence, a very studious, thoughtful, well-informed man, well read and thoroughly posted upon all the questions and issues of his time. He was a very positive man in his actions, opinions, and convictions, and firm and persistent in maintaining them. He was independent and aggressive in the assertion of his views upon any topic. He had always been a very set man, no one could change him from a course he had once marked out, no one could reason him out of convictions and conclusions that he had once reached. He was quick tempered, easily excited, with strong likes and dislikes, a warm friend and a strong hater of those.he thought had wronged him. He was fond of discussion, always serious and earnest, never speaking carelessly or at random. He was reticent as to his own affairs, but rather inquisitive as to the affairs of others, anxious to succeed himself, he was equally desirous of the success of . others. He was a kind man, generous in his way, a man without guile, without malice toward any one. He was a good neighbor, kind, considerate, respecting all and being respected by them. He was a man of the strictest integrity in his dealings with others, a moral, conscientious, fervently religious man. In his family relations there -was the utmost cordiality and kindly feeling, affectionate, devoted to his wife and children, and being loved, respected, revered by them. He had always taken an active part in the affairs of his neighborhood and town, and was an influential man by reason of his unimpeachable character, his integrity, his fearless independence and good judgment.
Born in 1798 and dying in 1886, it will be seen that he lived in the most important and exciting times of our country’s history. From early childhood to his old age he had lived amid constant financial, social, political and religious struggles and excitements, and from early manhood he had always taken an active part in the discussions of the hour, and always took the side his conscience and not policy dictated as the wiser and better course.' From 1826-7 to the end of his life, he had one marked peculiarity, a peculiarity always prominent and which neither the observations of a lifetime, the arguments of others, the vanishing of the political party which once entertained the same views he did upon the question, the upspringing of other political parties of which he became a member, nor the mellowing and softening influence of time could obliterate from his mind. Over all and through all the questions and excitements that surrounded him, the lamp he lighted in early years did not cease its flickering in his old age and only went out by *759 death. This peculiarity was his opposition to masonry, and originated in the following manner:
In 1826, at the village of Batavia, N. Y., it became known, or was widely believed, that one William Morgan, who theretofore had been a mason, was about to publish a book exposing the secrets of masonry. While this report was prevalent in the community, and during the excitement attendant upon the discussion of the proposed exposure, it was claimed that Morgan had been abducted by masons. Committees of vigilance and safety were organized, which resulted, as was claimed, in' tracing the alleged abductors and their victim to Fort Niagara and Lake Ontario, from which point no trace of Morgan was thereafter discovered. Prosecutions were instigated against the alleged abductors, and repeated trials resulted only in the conviction of some of them upon minor charges, but no murder was ever judicially established, and could not, because the body was never found. An important political issue arose out of this excitement, and a political party was immediately formed, which became known as the Anti-masonic party, which, in 1828, gave its candidate for governor 3,300 votes, and at the next election gave its candidate for governor 128,000 votes. Candidates for minor political offices were nominated by this party and elected or defeated upon this issue, the late Hon. William H. Seward being a candidate, and we think elected at one time for some office upon this ticket. The excitement spread into other states, and in 1831 a national Anti-masonic convention was held, in which most of the free states were represented, William Wirt, the eminent jurist, being its candidate for president.
To this Anti-masonic party, the testator, then a young man, became attached and supported it during its existence. From the evidence on the trials of the alleged abductors of Morgan, from the arguments and discussions of the hour, there can be no question but that Mr. White became thoroughly and conscientiously convinced that masonry was a corrupt and dangerous institution, no doubt from the evidence that he believed with all the intense earnestness of his nature that its members were bound by some secret oath to stand by each other right or wrong. These prejudices of his early years he never outgrew. The convictions of early manhood became the conviction of his later years. The continual drip of the waters of time for sixty years left not the slightest impress upon the rock of his convictions. His views upon this subject were well known to every neighbor and to his acquaintances in a large portion of the county, for he was as free to criticise the masonic fraternity as an institution as he was the principles and policy of the democratic party to which he was earnestly opposed. There *760 was no concealment of his thoughts upon this subject. At all times and on all occasions whenever the matter was brought to his attention he did not withhold his sentiments from any one upon this topic. One of the witnesses who had been acquainted with him for fifty years, said he was an Anti-mason of the strongest type, that he thought Morgan was kidnapped for exposing masonry, and said no man could get law or have justice done him, to go to law with a mason if he was not a mason himself, that he always heard him say this from Morgan’s time down. He was equally opposed to all other secret societies, and claimed the Odd Fellows society was but a nursery for masons. He believed the masons were bound by a secret oath to stand by each other right or wrong, that masonry was a dangerous and corrupt institution.
But notwithstanding these facts thus testified to by a witness who had long known him, he was on the most cordial terms with all his masonic neighbors and acquaintances throughout the county. Whether a person was a mason or not, made no difference with his social or business relations with them, he was the same kind neighbor and good friend to all. Mor did his views upon the subject of masonry make any difference with the relations of his masonic neighbors and friends towards him. They knew his views. They knew he was conscientious in all that he said against masonic organizations, and while disagreeing with him upon this subject, they respected him none the less as citizen, friend and neighbor. Mo one—at least there is no evidence of it—thought him insane because he held these views, nor was it believed that he was laboring under an insane delusion for the time being when he uttered the sentiments and convictions of his earlier and later years. Those who disagreed with him belived he was simply laboring under a harmless prejudice. The idea that it was an insane delusion never entered the thoughts of any one during his life. It was known that his convictions were formed when a young man, after years of excitement and discussion by the ablest and most intelligent men of the time, and they knew he was sincere, conscientious, earnest in his belief, and they conceded and respected his right to that belief as much- as they respected the right of every other man to hold opinions contrary to their own. Men knew his denunciations were aimed, not, against them as individuals, but against masonry as a social institution in the land. Against masons as private citizens he had no prejudice, none that would lead him to act. differently towards them in all the relations of life.
We have said no one thought him insane before his death, because during all his life he had entertained the views so freely expressed upon the subject of masonry. And public sentiment was right in this respect, for insanity *761 is said to be a departure from the state of feeling and mode of activity usual to an individual when in health. In Mr. White’s case, since 1826, there was no period of his life when there was any departure from his usual mode of thinking and acting upon the subject of masonry. No writer upon the subject of insanity will claim that every member of the once large anti-masonic party of this state and nation was a lunatic, so that it wifi, be conceded, we think, that Mr. White, when he formed his views, was sane and laboring under no insane delusion. If he was sane in his early manhood upon this subject it would be a very illogical argument to assert and a very absurd conclusion to follow to hold that while entertaining the same view in his old age that he did in early manhood he was for that reason insane. The fact that the anti-masonic party passed out of existence many years since, and but few surviving members, if any, remain in the country, did not deprive him of the right still to maintain and assert his convictions. It may be said, of course, that the observations of a lifetime ought to have changed his views, that what he observed in regard to his neighbors and friends and what he saw of the masonic order ought to have convinced him that his opinions were unfounded, but they did not and his right to entertain the convictions of his reason and his judgment, however unjust and unfounded, was just as sacred as the right of any individual to hold opinions obnoxious to his fellow men and to society, however baseless may have been their foundation. His opinions were not the product of a disordered brain and therefore were not insane delusions, up to 1880, when he had his paralytic shock, whether they were after that time is a question for further consideration.
Had he never entertained anti-masonic views, never had any prejudices against the masons till after this sickness in 1880, and then for the first time in his life such delusions and prejudices had come into existence there would then have been a marked departure from his ordinary mode of thinking and acting when in health, because “when a person without adequate cause adopts notions he once regarded as absurd, or indulges in conduct opposed to all his former habits and principles, or changes completely his ordinary temper, manner and dispositions, the man of plain, practical sense indulging in speculative theories and projects, the miser becomes a spendthrift and the spendthrift a miser, the staid quiet, unobstrusive citizen becoming noisy, restless and boisterous, the gay and joyous becoming dull and discontented, even to the verge of despair, the careful, cautious man of business plunging into hazardous *762 schemes of speculation, the discreet, and pious becoming shamefully reckless and profligate, no stronger proof of insanity can be had.” 1 Bouvier Law Dic., 807.
From a very early period in life Mr. White had owned and always lived upon his farm in Nelson. There was sixty acres of this land. By careful tillage the farm had come to be noted for its productions, for the neatness every where apparent upon its surface and the good order which always seemed to prevail in its management. Its soil was every where kept free from weeds, stones and useless brush, its buildings- were kept up with scrupulous care, its walls and fences in good order, in a word the land had been brought to the highest state of cultivation, it was known as the model farm of the town and he as a model farmer. For his farm and home he seemed to have an affectionate, almost sentimental regard, every rod of land had become almost sacred in his eyes. On the west side of this farm James Wetmore and Edward Lewis were the adjoining owners, and Mr. Wetmore and White had thus been owners for forty years or more, Mr. Lewis about ten years. The division line between the farms was supposed by all parties to be a straight line. In 1884, Mr. Wetmore was desirous of rebuilding his portion of the division fence between him and Mr. White and was anxious to build exactly on the line; the action of the frost and weather and other circumstances making it somewhat uncertain whether the old fence was on the division line. For the purpose of ascertaining where the true line was Mr. White and Wetmore agreed to hire Mr. Townsend to survey the line and he accordingly did so. Upon the day this line was surveyed Mr. White thought it would be well to have the line surveyed between him and Lewis, whereupon, without the knowledge of Mr. Lewis, and in his absence from home, Mr. Townsend surveyed the line. The fence had been built for fifty years or more, and when the line was run the survey showed that the fence was in some places on Lewis and in some place on Mr. White, the quantity of land on the wrong side of the line as shown by the survey being but a few rods in quantity and of small value. Mr. White was not satisfied with the result. He thought there must be some mistake, and upon talking with Lewis it was agreed that M. N. Campbell, of Lebanon, and Mr. Townsend should run the line together. This was done in August, 1884, two or three weeks after the first survey and resulted the same as Townsend’s survey. He then said to Lewis he was not satisfied with the survey, that he had heard bad reports about Campbell and that he, Lewis and Campbell were masons. A short time after this, in 1884, Mr. Lewis was at Mr. White’s house and had a *763 conversation with the testator at which the contestant happened to be present. As Mr. White talked somewhat excitedly about the matter the contestant said to his father, let me talk for you, to which Mr. White said he could do his own talking yet. Some propositions were made to which Mr. Lewis assented provided Mr. White would build one-half the division fence along the woodland on the south side of Mr. White’s farm. Up to this time nothing had heretofore been said about building this portion of the fence. Mr. White claimed he was not obliged to fence against the woodland as he said it was open to commons, but the contestant told his father the law would compel him to build one half of this fence which Mr. White denied. There was talk about another survey and the contestant suggested Prof. Osborne, of Hamilton, and told his father that it made no difference about Campbell being a mason, that he, himself, was a mason, but he never thought of it in business matters. The consultation finally resulted as Lewis and contestant claim in an arrangement for another survey, though we understand that Mr. White subsequently denies that he had assented to such an agreement, the contestant jokingly saying- as the interview closed, “I ought to let you go to law and spend $500, for the benefit of the lawyers.” Some ten days after this, while Mr. Lewis was at White’s house to see about the survey and building one-half the fence against the woodland, Mr. White said he had not agreed to build the fence, that Deloss, the contestant, had told him he was obliged to build it, but there were other lawyers beside him who knew as much about it as he did and would not build it unless compelled to, that Lewis, Townsend, Campbell and Deloss, were all masons, and had conspired together to cheat him out of his land, that masons would conspire together to help one another out, right or wrong, claiming the fine had been run to suit Lewis and Wetmore. In September, 1884, he told Wetmore there was some fraud and deception about Townsend’s and Campbell’s survey, that Deloss was a rascal and a scoundrel, that Lewis, Campbell and Deloss were masons and banded together, and that Wetmore was as bad as the rest of them. In May or June, 1885, he told Wetmore that Townsend was not a competent surveyor, and upon another occasion that Deloss had deceived him; that there were other lawyers who knew as much as he did. In August or September, 1885, he told William Ensign that Deloss was a mason and combined against him, and that masons were no good. In June, 1886, he again spoke of Deloss as being a mason. In the fall of 1884, he told the surveyor Townsend that the survey was wrong, that Deloss, Horace Jenny, Lewis Campbell and he were all *764 masons and had conspired . together to cheat him out of his land; and they had bought him to run the line where they wanted it to beat him out of the land, that Lewis, Deloss and Gampbell had got it into their heads because they were masons, to aid Lewis. In October, 1886, he told Mr. Russel that he thought he was conspiring with the neighbors to cheat him out of his land, that Deloss was a mason and rode through there nights to conspire with them to cheat him out of his land; and told him no masons should have a bit of his property, if he could help it. In August, 1884, and also in August, 1885, he told one Woodman who had worked for him more or less for eighteen years, that Deloss was a mason. In the winter of 1884, he told Warren Payn, that a man who was not a mason could not get justice done; that masons were bound by their oaths to help each other, and told one Ensign the same in substance as to the others; that Deloss was a mason and had conspired to cheat him out of his land.
We have given the dates when Mr. White gave expression, to the alleged insane delusions for the purpose of showing that his delusions were not continuous, that if they were insane delusions there were long spaces of time when he was lucid and rational and entirely competent to transact business, for we understand the law to be that the will of a person ordinarily insane, of sometimes having insane delusions upon some subject, must be admitted to probate if it was made when he was having a lucid interval and laboring under no delusions with reference to those who claimed to be entitled to his bounty.
In view of the ground upon which we shall place our decision upon the question of insanity, to wit, that at the time the testator made his will he was not laboring under any insane delusions with reference to the contestant, it is unnecessary for us to express any opinion as to whether the alleged delusions were insane delusions or simply delusory prejudices which did not render him incompetent to make a will. But after the exhaustive discussion of the evidence by the counsel for the respective parties, it will be expected that we express our opinion on the subject and make findings in reference to the matter.
' We shall therefore find as a fact in this case that the expressions of opinion by the testator in reference to the contestant being a mason and acting collusively with other masons in reference to the survey, and in relation to building one-half the line along the woodland, were not insane delusions, but were simply a delusive belief, his prejudices against Lewis, Wetmore, Campbell, Townsend, and his son, simply delusory prejudices which in no manner affected bis capacity to make a valid will. Our reasons are as follows:
*765 First. From the time Mr. White first espoused the cause of anti-masonry, in 1826, to his death, he never had opportunity to know whether masons were bound together by a secret oath to stand by each other right or wrong. As he had never been a mason, his belief was based upon supposed facts, the truth or falsity of which he could not know from personal knowledge; his only evidence could be the assertions of masons, who of course withheld their records and the nature of their obligations to each other from him. His belief was formed from and based upon the evidence in judcial trials growing out of the alleged abduction of Morgan, from pamphlet and newspaper, from the arguments and discussions of the hour, and from the fact that so many able and distinguished men, so many thousand intelligent and thinking men coincided with him, he supposed from these and other circumstances, he had evidence upon which to found and maintain his belief. He had no power to compel the disclosure of the rules and regulations of masonry, and ascertain whether his belief was based upon facts or not, and so it was formed from such light as he could obtain.
Dr. Greenwood testifies that “if a man has facts presented to him and he still persists, that is a delusion, but if these facts cannot be presented to him, or are not presented to him, then it is not evidence that it is a delusion. I think he reasoned and acted understanding^ and correctly from the premises he occupied. I mean from the belief he entertained or was supposed to entertain.”
The following questions were asked the doctor:
Q. Suppose that the patient has been repeatedly informed of the falsity of the premises and he still persists in it, is that a delusion ? A. That would depend on whether he believed those who presented the reasons.
Q. Would you say it would be evidence of delusion if he should require other evidence than the statements of his neighbors and his son on the question of the oath or obligation taken by masons? A. Well, those that were not masons could not tell anything about the oath or obligation.
Q. Is it not some evidence of delusion that he should require more evidence than the statement of his neighbors and his son on the subject? A. He has not got a neighbor whose statement I would not believe. I don’t believe but that he would have believed if they were not restrained by secret oaths and obligations.
Dr. Greenwood testifies he had known Mr. White for over forty years; had been his family physician for over twenty-five years. He had known him intimately all this time as physician and friend, knew his peculiarities and his prejudices, knew his intelligence and his capabilities. Ho *766 man could be more competent to judge correctly than he in regard to the- character of his opinions or beliefs in relation to masonry. From the evidence of this eminent physician we draw the conclusion that from 1826 to August, 1884, Mr. White’s beliefs or prejudices in regard to masonry as a social institution were not insane delusions. If he had been put in possession of the facts relating to the oaths and obligations of masons, and then masoned wrongly about them, this, under some conditions, might be evidence of insanity, but not knowing the facts upon which his belief was based, it was simply a delusory belief or prejudice, and nothing more, at least down to the time of the survey by Campbell and Townsend.
But one of the main grounds upon which is based the claim of the contestant that the opinions of the testator after the survey as to his son were insane delusions, is the fact that in 1880 his father had a paralytic stroke. How severe it was or how it affected him, the evidence does not disclose. It evidently was a very slight attack, for the reason that there is no evidence which shows that at any time during its continuance or after his apparent -recovery from it, he did not think as clearly, reason as correctly, talk as rationally and intelligently, act with the same decorum and propriety, transact his business as prudently and maintain the same cordial relations with the members of his family and with his neighbors as before. He may have needed a little more assistance from his wife and daughter in the transaction of his business, but not because of any lack of judgment or intelligence or of any change in his opinions or prejudices occasioned by the paralytic shock. It did not cause any new delusions upon any subject or about any person, nor make his old delusions any more intense or more frequently uttered by him. There was no visible sign of any decrease in his mental vigor, save that which sometimes and ordinarily does accompany old age. But it is the evidence of his lifelong and confidential friend, S. P. Smith, that he was a very vigorous man for one of his years; so that it is very evident that his paralytic attack in 1880 had nothing to do with the delusions of which the contestant complains in 1884. They were too remote from such an alleged cause to be referred to it.
Besides this, the views entertained by Mr. White in regard to masonry have not wholly passed away. We quote from an associated press report during the past year from Chicago to the newspapers, as follows: “The congress of churches and Christians commenced its session here to-day, its object being the inauguration of a movement to crush out secret societies. About three hundred delegates, mostly men beyond middle age, were present—from the several *767 states. To-day the stage of the theatre where the congress was in session was set with a scene representing the interior of a lodge. Prof. H. H. George, of Geneva College was elected president. Hon. Halleck Floyd, of Hamilton, 0., denounced secret societies as inimical to American institutions. He said it was time for the press to take off the muzzle and speak out against masonry and all secret societies. E. D.. Bailey, of Washington Heights, followed with a similar address. Mr. Bailey is the editor of the American, at Washington. He denounced the lodges as the cause of poor attendance at prayer meetings, and the general lack of interest in religious matters. Rev. H. Wardner, editor of the Wesleyan Methodist, denominational organ, read a paper, “Secret Societies and the Civil Courts.” He claimed that the masonic oaths and obligations covered the concealing of all crimes, no matter how heinous, committed by a member of the fraternity, and that death was the penalty for doing otherwise.”
Mr. White never entertained views in regard to masonry more radical than those expressed above, never denounced it more fiercely, or accused it more strongly of being a dangerous and corrupt institution than was done by prominent and well-known men at the above mentioned convention. This prejudice sometimes crops out in wills. For instance, a short time since the will of Phineas Burdick, of De Ruyter, a man of considerable property, was admitted to probate in this county, in which he gives to the Seventh Day Church of De Ruyter the sum of $30X) for the support of its pastor, provided the society should not employ as its pastor or minister at any time a person who is a member of any secret society, and also on the further condition that the said church should not receive or maintain as members thereof any person who belongs to any secret society. It also gave about four or five thousand to three other religious institutions, but one of the conditions of the legacy was that no part of the income should be applied to the support or compensation of any person who is or may be at the time of his employment a member of any secret society.
We have called attention to the above facts for the purpose of showing that Mr. White’s views are still indorsed and approved by men of education and intelligence—that public conventions are sometimes held now as in 1826, and later, to condemn the institution of masonry, and that Mr. White, in clinging to the opinions and convictions of the past, is not a solitary exception in the community, and that his views being held by so many people, as appears by the Chicago convention. above referred to and otherwise, cannot be regarded as insane delusions up to August, 1884.
Second. We do not think they were insane delusions, after *768 the survey in August, 1884, within the definition of insanity, to wit, a departure from a person’s usual mode of thinking and acting, when in a state of health. For sixty years or thereabout he has been able to think, to reason, to act with sound judgment and discretion in regard to all business matters, but during all this time he had believed that masonry was a corrupt and dangerous institution, that its members were bound together by a secret oath to stand by each other right or wrong. When this survey was made in August, 1884, by Townsend and Campbell, his convictions were unchanged upon this subject, they were no more intense than they had ever been. A survey was made of the boundary line between himself and Lewis. It did not follow or correspond with the fence as it had remained for fifty years or more. If it was correct it would take from him in some places a few rods of land and necessitate removing the fence to the line as found by the surveyors, and he thought the survey must be inaccurate. In thus believing, he was not more unreasonable than men are quite apt to be when the landmarks which have become dear to them are about to be taken from their sight. Very likely the surveyors were right and he was wrong; but the line had been too long established for him to give up his convictions about it, without a struggle, and without a protest. He did not appreciate that the action of the frost, the weather, and carelessness in rebuilding or repairing, might have changed it from the true line. No adjoining owner had ever claimed that the line was not on the true line, and he could not understand why the compass had become his faithless friend and told a tale he could/ not believe. Xbout ten days after the second survey, it so happened that the contestant and Mr. Lewis were at Mr. White’s and had the interview which we have stated above.
This is the first allusion Mr. White had heard about building this fence. At this time the contestant told him he was a mason, but that it never made any difference with him in business, whereupon his father said then you are as bad as the rest of them. Here was satisfactory evidence to him why his son agreed with Mr. Lewis instead of him in regard to the law relating-to division fences—he was a mason. It corresponded with the convictions of a life-time, and was a conclusive argument to him that in a controversy between a man who was a mason, and a man who was not, the mason would agree with his brother mason, and stand by him right or wrong. The fact that his son was a lawyer and knew what the law was, made no difference to him. It was not until after this occasion, that Mr. White charged his son with being banded together with Lewis and conspiring to cheat him out of his land. He had no evidence of this, save the fact that the contestant joined with Mr. Lewis in asserting that the law would compel Mr. White to build one-half the fence along the woodland, but
*769 “ Trifles light as air Are to the jealous confirmations strong,
As proof of holy writ.”
Mr. White after this consulted some lawyer at Morris-ville, in regard to the matter, and claimed he was advised by him that he was not obliged to build the disputed fence. Here he had, as he thought, other proof that his son was against him and the only motive he could conceive for it was the fact that he was a mason. Whatever delusions he ever had about his son arose out of the incident we have related. Dr. Greenwood defines delusion to be a belief that something exists, which has no existance. But it will be perceived that he had evidence of the fact that his son disagreed with him about the fence and agreed with Lewis, who was a mason, about the law appliable thereto, and he reasoned from this fact in accordance with the convictions of a life-time. Was it an insane delusion thus to reason? It seems to us it would have been a departure from his usual mode of thinking and acting, when in health, if he had not thus reasoned. It was no departure from his usual mode of thinking and acting when in health, that he reasoned as he did, however incorrect his conclusions were. From his stand point he had conclusive evidence, as he thought, of the truth of his lifelong belief.
Third. We do not think they were insane delusions, because for a period of over two years from the time they first existed, there is no evidence that he mentioned the subject, except to ten persons, four of these, Lewis, Wet-more, Townsend and the contestant, at or within a very short time after the last survey; two were persons who had been in his employ for many years, the others were lifelong friends.
Dr. Olymer, in Bonard’s will, says: “Delusions take possession of a man, are his main subject of conversion, are constantly being recurred and referred to. A delusion is a man’s main thought, intruding itself upon nearly all occasions, as a general rule.”
The following questions were asked Dr. Olymer in the course of his examination:
Q. Whenever a person conceived something to exist, which has, in fact, no existence, and he is incapable of being reasoned out of this false belief; does it, or does it not, in your judgment, constitute, so far as that particular point goes, insanity?
A. No, sir.
Q. Would you not define a delusion to be a delusive idea —is not that a very good definition of a delusion?
*770 A. Of one kind of delusion it may be, but not of an insane delusion.
It is true that lunatics sometimes conceal their delusions, but it would not be expected a man of Mr. White’s temperment and characteristics would be likely to conceal his delusion, if insane, if it be true as Dr. Clymer says they take possession of a man, are his main subject of conversation, his main thought, intruding itself upon nearly all occasions, as a general rule. And yet who has heard him speak of the matter—a very important matter to him— a topic, which men, unquestionably sane, would make a frequent subject of conversation, for if there is any one question about which men are apt to get excited, and talk freely, it is about a disputed boundary. He has not spoken to as many of his neighbors and friends about his trouble with Lewis, as we should reasonably think, if conceded to have been sane. During these two years he has not been confined to his house so that he had opportunity of giving expression to his delusions. He has during all this time mingled freely with his neighbors, been frequently to surrounding villages to transact his business, and yet in but. few instances is there evidence that he made it a topic of conversation or ever alluded to the matter. Mr. White was a very social man, fond of talking with his acquaintances, and it would be strange, indeed, if all this time he was laboring under insane delusions, they did not crop out ocasionally, even if he made a studied and deliberate effort, to conceal them, and be a matter of comment in the community. Group the evidence of his delusions into a mass, and the first impression, is that Mr. White was laboring under constant delusions, but when the facts are separated and the dates clearly fixed in the mind, the illusion is quickly dispelled, and he reappears in his home, on his farm and in the community, the same stern old man, positive, unbending; and faithful to the opinions and convictions of his whole life. The testimony of witnesses is that he was always rather inquisitive as to other people’s affairs, reticent as to his own, and from the fact that he seldom spoke of the matter, it may reasonably be inferred that he looked at the matter in the same light he did his other business matters, and so said but little about it. In so doing he was acting naturally, consistently, and in accordance with his lifelong habit. We can readily conceive of a person shut up in an asylum, concealing his delusions from ordinary observers, but we cannot reach the conclusion that a man able to attend to his business, surrounded by friends, mixing in society, as laboring under insane delusions, under the circumstances disclosed in this case. But we can readily conceive that Mr. White, in a moment of passion or excitement, as we believe nearly every witness has said he was, wheu *771 giving expression to his alleged delusions, would say what he is proven to have said, and then the matter pass out of his mind, and he be uninfluenced by the so-called insane delusions. Men, when excited, give expressions to equally as baseless charges and insinuations, but we do not always regard them insane, because they happen occasionally to make unfounded assertions, or because they believe things to exist, which have no existence. In the case of Jones v. Hughes (15 Abb. N. C., 141), the court says: Exaggerating and absurd suspicions, if founded upon facts, from which the person entertaining them was satisfied to deduce them, are no indications of an unsoundness of mind, although extending very much beyond what is justified by the circumstances. Hence they do not disqualify one who is allowed to manage his own affairs by making a disposition of his property, which is binding on himself and on his heirs,
Fourth. In determining whether the testator was laboring under insane delusions for a period of over two years, the silence of the community upon the subject, the fact that his friends and neighbors, and those with whom he has done business during this time, and especially the conduct of his immediate relative is some slight evidence of his mental condition. The evidence does not disclose that those who must have heard, if they did not otherwise know of his alleged delusion, took the slightest interest in the matter. It was simply in the line of thinking and acting of Mr, White all his life,. and so no attention was paid to the matter, but we more especially call attention to the conduct of the contestant during this time. As early as August or September, 1884, he was aware of his father’s delusions with reference to the survey and after wards learned that he was charged by the testator to be in league with Lewis and others in reference to it. On one or more occasions he had sought to disabuse his father’s mind of the delusions as to himself, but having always known his father’s strong prejudices against the masons he seems to have thought his delusions were not insane delusions because after October 1885, he severed all social and business relations with him and left the testator to manage his own affairs with the assistance of his wife and daughter, left them to take care of an old man whom he now claims was insane and incompetent to dispose of his property. We cannot believe that if his father’s delusions impressed him at that time as insane delusions he would have neglected to bestow that care and attention upon him which he was entitled to receive from his son if he was insane. The fact that his relations with Mrs. White were not pleasant or intimate would have made no difference with him. Nor would he have taken offense at what Mr. White said to him, if he did get offended, because it would have been quite unreasonable for one to get offended at the sayings or *772 delusions of a lunatic. If he believed him insane all this time we should have supposed that he would have kept up his social and business relations with him, and not left this old man to the sole and only care of his wife and daughter, he at least would have bestowed such attention as his father needed from his son, if insane. No physicians were called by him to examine his father if he had doubts about the character of his delusions and learn from them the true state of the case. He was treated by the contestant as if he was entirely sane and competent to take care of himself and his property. Such at least is the inference we draw from the fact that he left him to take care of himself as best he could with his wife and daughter, for if it was his judgment after knowing of the delusions of the testator, that he was laboring under insane delusions, we should have supposed he would not have remained away from his father’s house for a year before his death, and would, so far as his health and business engagements permitted, have taken opportunity to know his real condition from personal visits to the old home. Possibly^ if this had been done he might have disabused his father of his delusions as to himself and so this contest been avoided. It is not impossible but that the severance of all relations with his father may have had something to do in strengthening his suspicions against his son, because the reason of his absence was never explained to him. A child is never so old but that a father thinks he has the right to correct, criticise or condemn his or her conduct without giving offense.
Fifth—Dr. Pilgrim, of the Utica asylum, a very eminent specialist in his profession, gave his opinion on this trial, based upon a state of facts claimed to have been proven in this case in reference to Mr. White. He said the testator from 1884 to his death was laboring under what he termed delusional insanity. The following questions were put to him after fully describing the testator, his relations to* his son and his acquaintances, his health and his delusions; “what would be your opinion as to whether such a man was capable of making a will while laboring under that condition, and properly disposing of his property as regards his son suggested in the (former) question?
A. I think he was not in condition to make a just will uninfluenced by the delusions.
Q. What would you say as to whether he could make a will uninfluenced by the delusion?
A. I think he could not. ■
For the purpose of showing that Mr. White’s delusions were not insane delusions and that he was competent to *773 make a just will, uninfluenced by his delusions as to his son, we will contrast fact with theory.
In October, 1884, three months after the survey, and the discussion about building the new line fence in which his son took part, at a time, when, if ever, we should expect his delusions in reference to his son to influence him, at a time when his troubles were fresh in his recollections and before lapse of time and reflection had modified his delusions, his feelings or his prejudices, he made a will which was drawn by S. P. Smith and witnessed by himself and Mr. Phelps, and at the time of its execution he said to Mr. Smith as follows: “ The statute divided a man’s property about as near equal as it could be divided, but he had promised his wife to make a will and he would make it. He said the principal property was what he had accumulated before marriage, his wife was well off, worth more than he was, and if he should give to Alida (his daughter) it would go to the Seymour family if she should die without issue, and he thought it ought to go to his family. He spoke about having made a previous will, said it was made when he was sick, said he was Capt. White yet.” He then executed a will in and by which he gave the use of all his property to his wife, at her death one-half he devised to his son, the contestant, the other half .to Alida, but with the provision that if she died without issue her share should go to his son.
We apprehend this will be regarded as a very just will by the public generally, or if unjust at all, to Alida, who only got the use of one-half his estate after her mother’s death.
We discover in this will and the circumstances surrounding it no evidence of delusion, and that the will itself thoroughly disposes of Dr. Pilgrim’s theory that Mr. White could not make a just will, so far as his son was concerned, for he obtained one-half the property and the whole except in one contingency.
If our conclusions are correct that Mr. White, at the time he made this will, had a proper appreciation of his property and his relations to each member of his family, and that it is a just will, we suppose the explanation will be that his delusions had become modified toward his son, or that they did not influence him on that particular day, that he made the will during a lucid interval, and hence, notwithstanding his delusions before and after it, it was a valid will. This is sound law, and we invoke it in support of the will in question, and shall hold that if Dr. Pilgrim’s opinion be correct, that Mr. White, for two years before his death, was laboring under delusional insanity, the evidence is clear that he was not laboring under any delusions at the time he made his last will.
*774 Fifth—Mr. White’s last will was made July 20, 1885. We need not recapitulate all the facts in relation to its execution. The testator was apparently in his usual health, he was able at least to superintend his haying, and was out on the roadside getting some broken pieces of machinery ready to be taken to the blacksmith shop when called upon to make his will. He rides with Mr. Northrup some distance to the house of an old friend to have it witnessed, and after its execution has a talk with some old acquaintances and comes away, bringing the will, and goes home on foot. After this he and his wife drive to West Eaton to have the pitman fixed. He then has a talk with Mr. Collis, the blacksmith, who said to him, “How is Deloss getting on?” to which he said, “ First rate,” then he said to Mr. White, “ Deloss will have quite a little dowry when you get through,” to which he replied he had paid Deloss off, but did not say how much or how. Here it will be seen that when his attention is called to his son and the disposition of his property he gives no evidence of entertaining any delusions in reference to him, nor do the two hired men at work for Mr. White testify to any delusions upon that day or to any irrational conversation. There is no evidence of any delusions for a month before or for at least a month afterward. For a period of two months the evidence does not disclose any delusions. S. S. Dunton, who lives in Morrisville only five miles from Mr. White, testifies that he was in his shop to have blacksmithing done, coming generally alone, that he was there July 2, June 23, September 25, November 25, and December 17, and in 1886 he was there twice in May, July once and August twice. From this evidence we have the right to assume he was at other places for the transaction of business. This evidence shows he was generally in such a state af health and mental vigor that he was capable of reflecting upon what he had done and of making a new will if he thought the one he had made was not right. Mr. S. P. Smith of Morrisville, frequently saw him at that place, talked with him on the street and at his house, where he was quite accustomed to take dinner. He had drawn three wills for him, was his confidential friend and if he desired to change it he could have done so unbeknown to his wife if he had thought his will was unjust to his son or was made under the influence of undue prejudice against him. It seems very clear to us that at the time he made his will he was competent to make it, and it must therefore be held valid.
Sixth. Nor do we think he was laboring under insane delusions when he made his last will for the reason that in June, 1884, when he is conceeded to have been free from any delusions as to his son, before the survey had been *775 made and when the most cordial relations existed between the two families, at a time when he was competent to take an unbiased view of his relations to his son and the share of the property to which the son was entitled, he made a will in which he gave only $250 to the contestant and the remainder to his wife and daughter, while the will in controversy gives him $150. At the time the last will was drawn Mr. White gave as a reason for thus reducing the amount to his son from the sum named in the will of June, 1884, that his property had depreciated in the last year, and $150 then would be as much in proportion as $250 the year before. If he was laboring under insane delusions at the time his last will was made it is certainly a very singular incident that he should have happened to have named a bequest so similar in its character to the will of 1884, when he is concededly free from any delusions towards Ms son. When upon the most friendly terms with Ms son, of unquestioned capacity to make a will, he only gave him $250, can it it be evidence of insane delusions that he only gave Mm one hundred dollars less a year thereafter, especially when he gives an intelligent and rational answer for so doing. Two wills of such similar character within the space of one year, indicate a purpose on his part to give the bulk of his property to his wife and daughter for reasons satisfactory, or at least only known to himself. The fact that he told Mr. Northrup, who drew the will of 1884, why he wished to change it, so as to give $150 instead of $250, shows that he was not laboring under insane delusions toward Ms son, shows that he understood clearly what he was about, and clearly appreciated his relation to him.
The question of undue influence remains for discussion. All that Mrs. White is shown to have done in reference to the will is the fact that on the 19th of July she went to Mr. Uorthrup and requested him to come to the testator to draw some papers, and that on the 20th, after Mr. Eorthrup came to the house, she went to the piazza and called to him as he was busy fixing the machine, that Mr. White not hearing, or not paying any attention to her call, she went across the road, took hold of his arm, and said you are wanted in the house. Argument based upon opportunity to influence Mr. White, has been urged upon our attention. We do not think that any adverse influence should be drawn against the will on this ground, because that argument exists in almost every case where a husband and wife live together upon good terms. To make opportunity an available argument, it should appear that the testator was of weak mind, unable to resist importunities, so enfeebled by sickness, old age, or other causes, that he was unable to get away from Ms surroundings, among friends in whom he could trust, and where he could be free from any restraint, free from the watchfulness of greedy heirs, and beyond the influence *776 which would not leave him a free agent. Where the party is disabled by any cause from having a chance to act freely and independently, the fact of opportunity existing to bring about an unjust will, always has great weight with the court. But in this case the argument of opportunity is shorn of its force by the fact that, with the exception of a short sickness in 1884 until his last sickness, he was not under restraint from sickness or other causes, that he attended to his ordinary business, was able to ride about the country, and was where he could have executed another will freely, unrestrained by the influence of any one. This will was executed a mile away from lfls home, surrounded by life-long acquaintances, and had the opportunity to make such will as he liked, when his wife was not present. Had she desired to coerce him by her presence, she would have had the will executed at the old home, had she desired to watch over the details of its execution, she would have avoided the visit to Mr. Isbell’s. The opportunity to influence was a necessity in this case because of her relations to her husband, she could not have prevented it if she desired to save by abandoning her husband in his old age. For the reasons we have given and others that might be suggested, we have no right to draw the inference of undue influence from the mere fact of opportunity in this case.
In Seguine v. Seguine, 4 Abb., court of-appeals decisions, it said: “ Undue influence must be an influence exercised by coercion, imposition or fraud. It must not be such as arises from the influence of gratitude, affection or esteem, but it must be the ascendency of another will over that of the testator, whose faculties have been so impaired as to subject him to the controlling influence of force, imposition or fraud. Moreover the exertion of the influence upon the very act must be proved, and it will not be inferred from opportunity and interest.” The evidence does not disclose ■ a single fact showing that either Mrs. White or Alida ever attempted to influence him in relation to the disposition of his property, or any acts from which undue influence can. be inferred. Notwithstanding Mr. White’s age, and the infirmities which sometimes attend old age, he was a man of more than ordinary vigor of intellect, he retained his firmness and tenacity of purpose as strongly as ever, and as he boasted was “Captain White still,” and he was not in a. condition to be imposed upon, coerced or unduly influenced by his wife. He transacted business at home and abroad, and clearly understood at all times what he was doing. All that Mrs. White is shown to have done in connection with the will in question was to ask Mr. Northrop to come to Mr. White’s to draw some papers, and the next day after Mr. Northrop was at his house, to call him from the field *777 to the house for the purpose of telling Mr. Northrop what he wanted done in regard to his will. Beyond these two facts the evidence discloses no affirmative act of hers. But it is claimed she was interested in procuring a will _ to be drawn which would be favorable to herself. This is undoubtedly true of Mrs. White, but no more so of her than it is of a majority of wives.
In Gardiner v. Gardiner (34 N. Y., 155) it is said: “Lawful influence, such as that arising from legitimate family and social relations must be allowed to produce its natural results, influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it, and there can be no presumption of its actual unlawful existence, merely from the fact that it is known to have existed, and that it has manifestly operated on the testator’s mind as a reason for his testamentary disposition. Such influences are naturally very unequal, and naturally productive of inequalities in testamentary dispositions, and as they are lawful in general and the law cannot criticise and measure them so as to attribute to them their proper effect, no will can be condemned because the existence of such an influence is proved, and because the will contains in itself proof of its effect.” This decision is ample authority for holding that there is no impropriety in the wife soliciting her husband to make provision for her support in case of his death. One cannot long be surrogate without being convinced that it is not only a legal right but the duty of wives some times to urge their husbands to make provisions for them against want or dependence upon others. It would have been far better for many widows in this country if they had been sufficiently thoughtful to have requested their husbands to make suitable provisions for them by will, a request which in most cases would have been readily complied with. The farm or home of which the husband died the owner, may have been acquired by the wife’s industry and economy as much as his, but again in case of his death, without a will in her behalf, she would only have a dower interest in it, which in most cases amounts to but a trifling sum, and thus she is left dependent upon her own exertions, the kindness of her children if she has any, or the charity of her friends or the public. The farm which she has" toiled so hard all her life to secure, she sees taken from her and divided among others, the home which she hopes to enjoy in her old age, in the hands of strangers. Her lack of experience in-the ways of the world, her want of knowledge as to her legal rights, her belief that her husband, at some time, would make suitable provisions for her, her over confidence that his legal *778 heirs would not neglect her, and would, in some way, provide for her, may have led her to overlook, at least not to appreciate, _ the possibility of the future for her. In our judgment it is her duty to guard herself in such cases against dependence upon any one for support in case of her husband’s death, her duty to protect herself against want, or charity, or dependence, if she can do so, without coercion, fraud, or undue influence, or other illegal efforts. The law gives her the legal right by honest intercession and modest persuasion, to make suitable provisions for herself. In his lecture upon the settlement of estates, the late Judge Kennedy said as follows: “ Every person whose property would not descend by virtue of law as would be just, ought to make and execute his will. Do it while you are in health, and can properly appreciate and estimate the judicious disposition of your estate. I trust you will not deem me officious when I recommend that you take your wife into your confidence in relation to its provisions. Her keen perception will often aid you in solving and determining the often difficult discriminations to be made. When this is done, there will be left no unpleasant memories or heart-burnings, and you will have greatly benefitted and assisted her in entering upon their great responsibilities which a widowed mother has to assume.” In another place he says: “Allow me, however, to say, that, in my judgment, as a general rule, ample provision should be made for the wife, to ensure her comfort and support. It is a great deal better for the children to let them be under obligations to their mother, than for the mother to be dependent upon them. At least, such is my observation and experience.” And the present surrogate heartily concurs in his suggestions, based upon his experience and observations since he has been in office. Knowing the unfortunate and dependent conditions in which women are sometimes placed by lack of forethought in not making a will which gives a comfortable support to the widow, it is not surprising that wives sometimes take undue advantage of the sick and the aged to procure wills which, while they provide for themselves, are sometimes unjust to others; not surprising that the sick and the dying are asked to do an act which in health they have neglected to do; not surprising that at such times they sometimes wring from unwilling hands a will which would not otherwise be made—a will which may possibly do great injustice to the legal heirs. Recognizing as we do the legal right of the wife to induce her husband to make a will, provided he is competent to make one and no improper influences are brought to bear upon him, which will provide for the widow suitable maintenance, we should not regard the fact if it were proven in this case that Mrs. White talked with her husband about the disposition of his property, and urged him when in proper condition of health to make suitable provisions for her and her *779 daughter, if not carried beyond the rule laid down by the courts as evidence of undue influence but simply the exercise of a legal right, the performance of a duty which she owed to herself. There is, however, ho evidence in the case that she sought to influence him in any respect, no evidence that he even consulted her about its conditions, no evidence that she ever knew the contents of the will in question, until it was offered for probate. With such a lack of evidence in regard to any act of hers in inducing the making of the will, we have no right to draw the inference of undue influence on the part of Mrs. White from the simple fact that she had the opportunity or the selfish interest to procure the will in question to be made.
We are asked to draw the conclusion of undue influence, because it is claimed there is evidence of a change of testamentary intention on the part of Mr. White. It has been proven by different witnesses that at various times during his life he had expressed disapproval of making wills, and declared that the law makes the best will or a just will, divides the property equally and justly among the heirs. With one exception, these remarks were all made before he made any will. When a person has once made a will and subsequently makes radical changes from his former will under suspicious circumstances, this fact often has an important bearing in determining whether the last will was made free from undue influence, fraud or imposition, and when the testator was of sound disposing mind and memory. But when a person who has never made a will indulges in such remarks, we think no conclusion of undue influence should be drawn from the simple fact that he subsequently made a will, because if he has a wife and children living the law does not always make a just will—it may divide the property equally among the heirs, but equality is not always justice. He may have a sick or helpless child, he may have given—not advanced—more liberally to one than another; he may have a spendthrift child to whom it would be useless to leave property uncontrolled by a trustee; he may have a wife who needs far more than her dower interest in his estate for her support; his wife or child may not be competent to settle his estate. Indeed it is impossible to name all the circumstances which would render the statutory disposition of his property either just or equitable, and these considerations might suggest to him the necessity and the propriety of making a will—these considerations might induce one who for many years had believed in the theory that the law always made a just will to change his views on this subject and make a will. Again he might possibly be impressed by the idea that it would be well to make a will in order to save his widow the necessity *780 of giving bail as administratrix of his estate, often compelling her to find some one who is willing to act with her in order that the necessary bond may be given. Besides this he might be influenced by the fact that it often saves long delays and great expense to make a will and give his executor authority to sell his real estate if necessary for the payment of his debts and for other purposes. For want of a will simply authorizing an executor to convey real estate, tedious and costly proceedings are constantly going on in the surrogate’s office for the sale of land to pay debts, all of which might be avoided by making a will, costing the testator but a trifling sum. These and other considerations will readily suggest themselves to those familiar with proceedings for the settlement of estates, when the law does not always make a just will for a man having a wife and children. If he is entirely satisfied with the statutory disposition of his estate he still acts unwisely and against the interest of his heirs when he neglects to make a will and appoint an executor with authority to convey his real estate if necessary for the payment of his debts or for other purposes, and sometimes save to his heirs vexatious and costly proceedings to settle his estate. If then a person who has entertained the views that Mr. White did in regard to making wills, changes them for good and sufficient reasons and decides to make a will, we do not regard this fact alone as a circumstance from which we should draw the conclusion that he was acting under undue influence, and so draw an unfavorable inference against his will, because we think a man is to be commended rather than criticised for making a will if he has the legal capacity to make one and is not unduly influenced to make it.
It is claimed by the contestant that his father’s will bears upon its face the impress of undue influence because it is an unjust will as to him. From Wharton & Stilles’ Medical Jurisprudence, vol. 1, § 81, we quote the following: “ It must be remembered that the justice of testamentary dispositions is to be determined from the testator’s standpoint, not from the standpoint of the adjudicating tribunal. Provisions which may strike us as very unjust, may have seemed just to the testator and might seem just to us if we were possessed of all the facts of which he was possessed. Notions of justice- also vary as much as do the conceptions of facts to which these notions are applied. To one mind it may seem very unjust to give a preference to an older son, to another it would appear that daughters should be preferred, as the most helpless, to another bequests to collateral relatives may seem a duty, to another it may appear a matter of duty to give largely to educational and religious institutions. The law, in reserving to all sane persons the right *781 of testamentary disposition, and in declining to establish a universal compulsory rule for the disposition of property after death, recognizes a variety of judgment among sane persons as to the way their property should be distributed. That a will is not the kind of will that the adjudicating tribunal would make, is therefore no reason for setting it aside.” From this statement of the law it will be seen from the facts as we have found them in this case, it is not for this court to determine whether it is a just or an unjust will. It may not have been entirely satisfactory to the testator, but from the standpoint of his surroundings it may have been as just as he could see the way to make it. His real estate had been acquired before the death of his first wife, the larger portion if not all his personal property after the second marriage, so that the son and daughter would stand on nearly equal terms so far as the acquisition of property is concerned. He knew that his son had become an able and successful lawyer, and believed that he was worth more than he was and was able to provide for himself and family. He knew his daughter was unmarried, and possibly might never marry, that the avenues of business for the acquisition of property were closed against her, that it would be her duty to remain at home and care for her mother in her declining years, and may have felt that the use of one-half of his small estate would be insufficient to support her in that position in society which her character and social position demanded, and so came to the belief that if he gave her all he had, she would not have more than sufficient to place her in an independent position during her life. Besides this, his son had been absent from home since he was twenty years of age, his daughter had always remained at home, she had been feet to his weary limbs, the pen to his trembling hand, eyes to his receding vision, day and night she had been constant in her care and devotion to him, a sure and trusty staff for him to lean upon in his old age, and it would not be unreasonable to suppose that in the scale of parental judgment his affection for his daughter outweighed the idea of justice to his son, he may have felt that for such a daughter all that he had was not too much to provide for her happiness after he had passed away. So too, by reason of the son’s necessary absence, he probably felt more and more as the years passed away his dependence upon her, that he would be compelled to rely upon her for these acts of duty and devotion, these acts of kindness and assistance which his old age would necessarily require, and appreciating all the possible demands of the future and his dependence upon his wife and daughter under the circumstances which existed about him, he may have reasoned that he was doing no injustice *782 to his son and only justice to his daughter in making the will he did.
That the testator was satisfied his will was as near right as he could make it, is apparent from the fact that it was made July 20, 1885, and he did not die until October 23, 1886. For more than a year he had opportunity to reflect upon what he had done and determine whether his will was a just one or not. During all this time he was able to drive his own team to neighboring villages for the transaction of business, during none of this time was he confined to his house by sickness, or under the least restraint or coercion on the part of his wife and daughter. He managed his farm during this time, he hired and paid his help, he sold the products of his land, he dealt with his blacksmith, his merchant, his banker, his neighbors, and no one thought him incompetent to do business; no one thought him laboring under insane delusions, and so far as the evidence discloses any dealings with individuals he exhibited the same care and business habits he had always shown. They saw he was an old man, of course, but very vigorous, for one of his years. The will, ever since its execution, had been in his possession, and he had the opportunity to study its contents, and reflect upon its conditions, and, if unsatisfactory, he had the health, the opportunity, and the legal capacity to make a new one. Had he been confined to his house, after the will was made, surrounded by no influences save those of his wife’s and daughter’s, unable to talk with his old neighbors or confidential friends, denied opportunity for that reflection and judgment necessary for making a free and unbiased will, the case might look differently to the court; but with more than a year’s freedom to think and act, and form his convictions, we must assume that the conditions of the will were ratified and approved by him. If as he remembered the time of its execution, he acted under any undue influence or under unjust delusions against his son that Providence in whom he so confidingly believed had lengthened the time of his departure, and given him the health, and strength, and opportunity to remedy any wrong he may have imagined he had done his son. Having made no change in his will during all this time, it is our duty to accept his judgment in relation to the matter. Beside this the contestant, for some cause, had severed all business and social relations with his father, from October, 1885. From that time until October, 1886, when Mr. White was dying, he had not called upon him at the old home, or seen him elsewhere. For twenty years before this, he and his family had been frequent visitors at his father’s and had yearly purchased farm commodities from him. The family noticed this change of habit, on the part of the contestant, and thought it strange he did not come as usual to the old homestead. The father did not *783 seem to appreciate that he had said anything at which his son should take offense, or, if offended, which he ought not to overlook. But thus cut off from all relation with his son and his family at a time when the kindness and devotion of children is very dear to an aged parent, compelled to rely upon his wife and daughter to aid him in the management of his farm, in the transaction of all business matters, take care of him in sickness, and share with him the infirmities of his old age, it was not an unnatural expression to his old friend, S. P. Smith, a short time before his death, when he said to him, “ I am an old man, past making wills and very dependent,” and we think we may justly conclude from this remark that he felt he must leave his will as he had made it, because he was wholly dependent upon his wife and daughter for those attentions and assistance which his age and health demanded. Human nature is not always strong enough to rise above the influence of love and devotion on the part of a child, and if in such an hour it does not take a cold blooded view of the surroundings and give an equal amount of his property to the absent and the present should we criticise and condemn or accept the judgment of him who has the right to give to whom he may. It was for him when he made his will, and not for the court now to say whether it was a just or an unjust will. So long as he had the legal capacity to make his will, and was not illegally influenced in its making, he had the right to make such a will as his judgment or his sympathies suggested, and it is our duty to let that act remain unchanged.
We must close the discussion of this case, leaving much unsaid which the evidence and the arguments of counsel suggest. Whether right or wrong in our conclusions, a higher court has the right to determine. And as we write the concluding paragraph of this decision, there comes to us the words of Chancellor Kent, in reference to the will of an aged person: “It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law gives to a man, over the disposal of his property, is one of the most efficient means which he has in protracted life to command the attention due to his infirmities. The will of such an aged man ought to be regarded with great tenderness. when it appears not to have been procured by fraudulent acts, but contains these very dispositions which the circumstances of his situation, and the course of the natural affections dictated.” All we know of James D. White and of his family relations is what the evidence discloses. In our judgment he was a man who loved justice, and would endeavor to do justice by his family, as it appeared to him. If he erred in his conclusions it is not for us to rectify the mistake so long as he had the legal capacity to make a will. To give to one and withhold from another was a right which the law had given him. If he sought to bestow his prop *784 erty upon those who were the constant attendants of his infirmities, he simply exercised One of the prerogatives of his old age, which tins court has no power to take away. We do not for a moment, suppose his wife and daughter would have been less devoted or attentive to his needs if he had divided his property otherwise. His son had been absent from home since he was twenty years of age, his wife and daughter had been his daily companions for many years. Alida had grown into his affections, so became a part of his daily life,that all he had did not seem too much for what she had been to him in the past and all she might be in the future. Affection for her might have dictated the will, in which he gave her nearly all that belonged to him. ' If, under the circumstances in which he was placed, he did not think his son and daughter had equal claims upon his bounty, it was his legal right so to say by his will. Thus he has said, and from a careful examination of the evidence, we believe we have no right to interfere with the exercise of his judgment. A decree will therefore be entered admitting the will of James D. White to probate.